**THE CARLSON LAW FIRM**
Ruth Rizkalla (Bar No. 224973
Email: RRizkalla@carlsonattorneys.com
1500 Rosecrans Ave., Suite 500
Manhattan Beach, CA 90266
Tel: (800) 359-5690

**DICKEY ANDERSON LAW FIRM, LLC**
Aaron K. Dickey #6281731 IL
Email: aaron@dickeyanderson.com
1104 Moorlands Drive, 2nd Floor
St. Louis, MO 63117
Tel: (314) 810-7668

Attorneys for Plaintiff Linda Morris

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

LINDA MORRIS,

    Plaintiff,

vs.

ICU MEDICAL, INC., successor in interest by merger to SMITHS MEDICAL ASD, INC.

    Defendant.

Case No.: 8:25-cv-01333-JWH-JDE

**FIRST AMENDED COMPLAINT FOR DAMAGES**

(1) NEGLIGENCE.
(2) FAILURE TO WARN
(3) DESIGN DEFECT
(4) BREACH OF IMPLIED WARRANTY
(5) BREACH OF EXPRESS WARRANTY
(6) FRAUDULENT CONCEALMENT

**DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, Linda Morris, (hereinafter "Plaintiff"), by and through her undersigned counsel, and brings this Complaint against ICU Medical,

Inc., successor in interest by merger to Smiths Medical ASD, Inc., ("Defendant"), and alleges as follows:

1.    This is an action for damages arising out of failures relating to Defendant's design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defective implantable vascular access device sold under the trade name of Port-A-Cath II Power P.A.C. (hereinafter "Power P.A.C." or "Defective Device").

## **PARTIES**

2.    At all times material, Plaintiff, Linda Morris is an adult resident and citizen of Sussex County, Delaware, and claims damages as set forth below.

3.    Defendant ICU Medical, Inc. ("ICU Medical") is a Delaware corporation with its principal place of business located in San Clemente, California. ICU Medical is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Power P.A.C.

4.    Defendant ICU Medical, Inc. ("ICU Medical") is a Delaware corporation that, based upon public filings made by Defendant, merged with and became a legal successor in interest Smiths Medical ASD, Inc. ("Smiths Medical") on July 24, 2024. The merger occurred after the implantation and removal of the

defective port that is the subject of Plaintiff's claim. Smiths Medical conducted business throughout the United States, including the State of California, and is a wholly owned subsidiary of ICU Medical. Smiths Medical is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Power P.A.C.

5.    Upon representation by the Defendant, Smiths Medical's assets and liabilities were merged into the new ICU Medical entity, which occurred after Plaintiff's implant and explanation, and would be successors in interest (and liability).

## **JURISDICTION AND VENUE**

6.    This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

7.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District and (b) Defendant's products are produced, sold to, and consumed by individuals in the State of California, thereby subjecting Defendant to personal jurisdiction in this action and making them all "residents" of this judicial

1   District.

2      8.      Defendant has and continues to conduct substantial business in the State

3   of California and in this District, distribute vascular access products in this District,

4   receives substantial compensation and profits from sales of vascular access products

5   in this District, and made material omissions and misrepresentations and breaches

6   of warranties in this District, so as to subject them to *in personam* jurisdiction in this

7   District.

8      9.      Consistent with the Due Process Clause of the Fifth and Fourteenth

9   Amendments, this Court has *in personam* jurisdiction over Defendant because

10  Defendant is present in the State of California, such that requiring an appearance

11  does not offend traditional notices of fair and substantial justice.

12                          **PRODUCT BACKGROUND**

13     10.     Defendant's Vascular Access Devices were designed, patented,

14  manufactured, labeled, marketed, sold, and distributed by the Defendant at all

15  relevant times herein.

16     11.     The Power P.A.C. is one of several varieties of implanted port catheters

17  (IPCs) that has been designed, manufactured, marketed, and sold by Defendant.

18     12.     According to Defendant, the Power P.A.C. is a totally implantable

19  vascular access device designed to provide repeated access to the vascular system

4

for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

13.    The intended purpose of the Power P.A.C. is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

14.    The Power P.A.C. is a system consisting of two primary components: an injection port and catheter which includes additives intended to make it radiopaque.

15.    The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

16.    The Power P.A.C. is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

17.    The product's catheter is comprised of a polymer and a barium sulfate radiopacity agent.

18.    Barium sulfate is known to contribute to reduction of the mechanical integrity of polymers *in vivo* as the particles of barium sulfate dissociate from the

surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane.

19.    The mechanical integrity of a barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

20.    Upon information and belief, Defendant's manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

21.    This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissure, pits and cracks as well as sections of the catheter lumen which contain more than 30% barium sulfate by weight, reducing the catheter strength at those loci.

22.    The roughened catheter surface leads to the collection and proliferation of fibrinous blood products, thereby drastically increasing the risk of biofilm, infection, and sepsis.

23.    Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within

6

polyurethane), Defendant elected not to incorporate those design elements into the Power P.A.C.

24.    Among the most common and concerning complications associated with IPCs, such as the Power P.A.C. system, are IPC-related infections.

25.    There are several types of IPC-related infections. The most common and severe are CRBSIs, or CLABSIs, which occur when microorganisms, typically bacteria or fungi, colonize the surface of the catheter and enter the bloodstream.[1]

26.    IPC pocket infections refer to an infection localized in the subcutaneous pocket where the port is implanted. These types of infections most often occur within a few days of implantation.[2] If clinical signs appear in the IPC pocket after that time-frame, then it is most commonly related to a CRBSI.[3]

27.    The least common IPC-related infections are tunnel infections which occur when an infection occurs along the subcutaneous tunnel created for the placement of the central venous catheter.[4]

---

[1] Teichgräber, UKM., Gebauer, B., Saleh, A. Outcome analysis in 3,160 implantations of radiologically guided placements of totally implantable central venous port systems. European Radiology. 2011;21(6):1224–1232.

[2] Machat, S., et al. Complications of central venous port systems: a pictorial review. Insights into imaging. 2019; 10(1):86; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

[3] Baang JH, Inagaki K, Nagel J, et al. Inpatient Diagnosis and Treatment of Catheter-Related Bloodstream Infection [Internet]. Ann Arbor (MI): Michigan Medicine University of Michigan; 2023 Jan.

[4] Machat, S., et al. Complications of central venous port systems: a pictorial review. Insights into imaging. 2019; 10(1):86; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

28.   IPC-related infections occur through a multi-step process that begins with device conditioning followed by microbial contamination, microbial adherence and biofilm formation, and ultimately progresses to localized infection and/or bloodstream infection. Biofilm formation on IPCs is particularly problematic because of the frequent use and long-term placement of these devices. Microbial contamination, colonization, and biofilm formation on catheter surfaces can begin as early as 24 hrs. after insertion.[5]

29.   In vascular access devices (VAD), like Defendant's IPC, infections are closely linked to the development of biofilms on the surface of the foreign body.[6] Approximately 60% of hospital acquired infections (HAIs) worldwide are believed to be caused by micro-organisms forming biofilms on medical devices.[7]

30.   Once the biofilm is established, it serves as a reservoir for persistent infection. Biofilms are notoriously difficult to eradicate due to their resistance to both the host's immune system and antimicrobial therapy.[8] In most instances, antimicrobial therapy is not sufficient to treat these infections, as antimicrobials will

---

[5] Donlan, R. M. Biofilms and device-associated infections. Emerging infectious diseases. Centers for Disease Control and Prevention, 2002:7(2), p. 277; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

[6] Bustos, M. D., et al. Long-term Catheterization: current approaches in the diagnosis and treatment of port-related infections. Infection and Drug Resistance 2014:7 25-35.

[7] Treter, J., Macedo, a J. Catheters: a suitable surface for biofilm formation. Science against microbial pathogens: communicating current research and technological advances; Formatex 2011:835–842.

[8] Gominet et al. (2017); Bustos et al. (2014)

not remove/eliminate the biofilms and their embedded micro-organisms and thus device removal is required.[9]

31.    Although not an absolute requirement for microbial adhesion, the initial adhesion of proteins to the surface of a foreign body (also called conditioning) and thrombosis promotes biofilm formation. Immediately after insertion, a conditioning film composed of organic macromolecules from body fluids, such as fibrinogen, fibronectin, vitronectin, thrombospondin, glucose, and pyruvate, coats the catheter surface.[10] This is a natural response to a foreign body; however, this film unfortunately provides an ideal environment for microbial attachment.[11]

32.    This protein adhesion facilitates microbial adhesion in multiple ways. Protein adhesion creates more surface area for bacteria adhesion.[12] Protein adhesion allows bacteria to adhere to more diverse surfaces.[13] Proteins within the thrombus can attract microbial species.[14] Protein adhesion increases the risk of both biofilm

---

[9] Kojic, EM and Darouiche, RO. Candida Infections of Medical Devices. Clin. Microbiol. Rev. 2004; 17 (2):255-267.; Mack, D., et al. Biofilm formation in medical device-related infection. Int. J. Artif. Organs. 2006; 29 (4):343-59.

[10] Fletcher, S. Catheter-related bloodstream infection, Continuing Education in Anaesthesia Critical Care & Pain,  2005;5(2), pp. 49–51; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

[11] Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017); Nycz, A., et al. Surface Analysis of Long-Term Hemodialysis Catheters Made of Carbothane (Poly(carbonate)urethane) Before and After Implantation in Patients' Bodies. Act of Bioengineering & BioMechanics. 2018; 20(2).

[12] Palmer, J, Flint, S and Brooks, J. Bacterial cell attachment, the beginning of a biofilm. Journal of Industrial Microbiology and Biotechnology. 2007; 34(9):577–588.

[13] Li, Q., et al. Zwitterionic Biomaterials. Chemical Reviews. 2022; 122(23):17073–17154.

[14] Mohammad, SF. Enhanced risk of infection with device-associated thrombi. ASAIO journal. 2000; 46(6):S63–S68; Mehall, JR., et al. Fibrin sheath enhances central venous catheter infection.

formation and thrombosis, which are closely interconnected and create a reinforcing cycle.[15]

33.     Preventing microbial adhesion and biofilm formation leads to a significant drop in infection rates.

34.     IPC materials permit rather than inhibit microbial adhesion and biofilm formation.

a.     Surface roughness promotes biofilm formation and increases the risk of infection.

b.     Barium Sulfate ($BaSO_4$) diffusion increases surface roughness which promotes biofilm formation and increases the risk of infection.

c.     Biodegradation increases surface roughness which

---

Critical care medicine. 2002; 30(4):908–912; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067.

[15] Galloway, S. et al., Long-term central venous access, 92 British Journal of Anaesthesia 722 (2004); Fletcher, S. Catheter-related bloodstream infection, Continuing Education in Anaesthesia Critical Care & Pain,  2005;5(2), pp. 49–51; van Rooden, CJ., Schippers, EF., et al. Infectious complications of central venous catheters increase the risk of catheter-related thrombosis in hematology patients: a prospective study. Journal of Clinical Oncology. American Society of Clinical Oncology; 2005;23(12):2655–2660; Smith, RS., Zhang, Z., Bouchard, M., et al. Vascular catheters with a nonleaching poly-sulfobetaine surface modification reduce thrombus formation and microbial attachment. Science Translational Medicine. 2012;4(153); Busch JD, Vens M, Mahler C, Herrmann J, Adam G, Ittrich H. Complication Rates Observed in Silicone and Polyurethane Catheters of Totally Implanted Central Venous Access Devices Implanted in the Upper Arm. J Vasc Interv Radiol. 2017 Aug;28(8):1177-1183; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067.

promotes biofilm formation and increases the risk of infection.

        d.     Port Body material and structure can influence microbial adhesion and biofilm formation.

35.    Technologies exist that prevent biofilm formation and/or reduce thrombus accumulation which also reduces the risk of biofilm formation.

        a.     Antimicrobial catheters prevent and/or reduce the risk of CRBSI by preventing or reducing bacterial colonization and biofilm formation on catheter surfaces through traditional bactericidal (lethal) or bacteriostatic (inhibitory) mechanisms.[16]

        b.     Catheters with non-fouling coatings and substrates reduce risk of CRBSI by inhibiting its triggers—protein adsorption, bacterial adhesion, and biofilm formation on catheter surfaces.[17]

        c.     Catheters that incorporate both non-fouling coatings or additives (preventing protein adsorption and bacterial adhesion) *and* antimicrobial agents (killing bacteria) reduce the risk of

---

[16]  Zander, Becker. Antimicrobial and Antifouling Strategies for Polymeric Medical Devices. ACS Macro Letters. 2018;7(1):16-25; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067; Monzillo, V., et al. Chlorhexidine-silver sulfadiazine–impregnated central venous catheters: In vitro antibacterial activity and impact on bacterial adhesion. New Microbiologica. 2012; 35(2):175–182; Xu, LC., Siedlecki, CA. Antibacterial Polyurethanes. Advances in Polyurethane Biomaterials, 2016.

[17] Li, Q., et al. Zwitterionic Biomaterials. Chemical Reviews. 2022; 122(23):17073–17154; Zhang, Z., et al. Blood compatibility of surfaces with superlow protein adsorption. Biomaterials. 2008;29(32):4285–4291.

CRBSI.[18]

36.  Defendant's IPCs design, such as the Power P.A.C., increase the risk of infection.

     a.    Defendant's IPCs have rough and variable surfaces.

     b.    Defendant's uncoated IPCs permit rather than inhibit microbial adhesion, thus increasing the risk of infection.

     c.    Defendant's uncoated IPCs permit rather than inhibit thrombus accumulation which increases risk of infection.

     d.    Defendant's IPCs are impregnated with barium sulfate which increases the risk of CRBSI.

     e.    Defendant's IPCs are prone to degradation which increases the risk of biofilm formation.

     f.    Defendant's uncoated IPCs port bodies permit rather than inhibit biofilm formation and thrombus accumulation which increases risk of infection.

     g.    Defendant failed to incorporate technologies that reduce

---

[18] Zander, Becker. Antimicrobial and Antifouling Strategies for Polymeric Medical Devices. ACS Macro Letters. 2018;7(1):16-25; Li, Q., et al. Zwitterionic Biomaterials. Chemical Reviews. 2022; 122(23):17073–17154; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067; Singha, P., Locklin, J., Handa, H. Multipronged Approach to Combat Catheter-Associated Infections and Thrombosis by Combining Nitric Oxide and a Polyzwitterion: A 7-Day In Vivo Study In a Rabbit Model. ACS Appl. Mater. Interfaces 2020;12:907-9079.

the risk of infection even though numerous commercially available technologies exist.

37. If Defendant had incorporated safer alternative designs, then the incidence of IPC-related infections would have been reduced.

    a. If Defendant had incorporated antimicrobial/antiseptic technology, then the incidence of IPC-related infections would have been reduced.

    b. If Defendant had incorporated antifouling technology, then the incidence of IPC-related infections would have been reduced.

    c. If the Defendant had incorporated technologies that reduce surface roughness, then the incidence of IPC-related infections would have been reduced.

    d. If the Defendant had incorporated other technologies, such as combined non-fouling and antimicrobial surface modifications, enzyme treatment or heparin then the incidence of IPC-related infections would have been reduced.

38. At all times relevant, Defendant misrepresented the safety of the Power P.A.C. system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the Power P.A.C.

system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

39. At all times relevant to this action, Defendant knew and had reason to know, that the Power P.A.C. was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to infection, thrombosis, fracturing, perforating internal vasculature, and otherwise malfunctioning.

40. At all times relevant to this action, Defendant knew and had reason to know that patients implanted with a Power P.A.C. port had an increased risk of suffering life threatening injuries, including but not limited to: death; fracture; sepsis; thrombosis; thromboembolic events; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

41. Shortly after entering the market, Defendant began receiving numerous adverse event reports indicating that the Power P.A.C. could experience housing-reservoir separations. Based on these events, Defendant issued a Class I recall in early 2025 and advised providers to monitor for device defects. While specific

reports of fractured fragments migrating to internal organs or vasculature perforation have been alleged in patient litigation, these serious complications have not been substantively described in public recall documentation. Any such occurrences would likely stem from the core defect of port separation.

42.    Smiths Medical, in issuing the FDA Class I recall, confirmed that Power P.A.C. housing-reservoir separations 'may cause serious adverse health consequences' — including **therapy disruption, tissue or skin damage, air embolism, and even death** in the most serious cases. The recall notification also recommended clinical monitoring for signs of device failure. While additional patient-level harms have been alleged in litigation, the recall itself does not document cardiac tamponade, vessel or organ perforations, hemorrhage, or arrhythmias as verified outcomes.

43.    Defendant was aware or should have been aware that the Power P.A.C. had a substantially higher failure rate than other similar products on the market, yet Defendant failed to warn consumers of this fact.

44.    Defendant also intentionally concealed the severity of complications caused by the Power P.A.C. and the likelihood of these events occurring.

45.    Rather than alter the design of the Power P.A.C. to make it safer or adequately warn physicians of the dangers associated with the Power P.A.C., Defendant continued to actively and aggressively market the Power P.A.C. as safe,

15

despite their knowledge of numerous reports of catheter fracture and associated injuries.

46.    Moreover, Defendant concealed—and continues to conceal—their knowledge of the Power P.A.C.'s dangerous propensity to precipitate infection. Defendant further concealed their knowledge that the catheter design caused these failures and that these failures cause serious injuries.

47.    The conduct of Defendant, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff. Defendant had actual knowledge of the dangers presented by the Power P.A.C. System, yet consciously failed to act reasonably to:

a.  Adequately inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;

b.  Establish and maintain an adequate quality and post-market surveillance system; or

c.  Recall the Power P.A.C. System from the market.

## SPECIFIC FACTUAL ALLEGATIONS AS TO LINDA MORRIS

48.    On or about January 7, 2020, Plaintiff underwent placement of the Power P.A.C., catalog number 21-4483-24, lot number 3894409. The device was implanted by Dr. James Spellman, at Beebe Medical Center, in Lewes, Delaware,

for the purpose of administering chemotherapy and other treatments associated with her stage III melanoma of the skin of the lower limb, which was node-positive.

49.     Defendant, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed and sold the Power P.A.C. that was implanted in Plaintiff.

50.     Defendant manufactured, sold, and/or distributed the Power P.A.C. to Plaintiff, through her doctors, to be used for administering chemotherapy.

51.     On or about June 23, 2023, Plaintiff's defective port was removed by Dr. Christelle Chedrawy at Christiana Hospital in Newark, Delaware, due to fracture in the catheter, which resulted in embolization to the right atrium and ventricle of her heart.

52.     At all times, the Power P.A.C. was utilized and implanted in a manner foreseeable to Defendant, as Defendant generated the instructions for use and created procedures for implanting the product.

53.     The Power P.A.C. implanted in Plaintiff was in the same or substantially similar condition as when it left the possession of Defendant and in the condition directed by and expected by Defendant.

54.     Plaintiff and her physicians foreseeably used and implanted the Power P.A.C. and did not misuse or alter the Power P.A.C. in an unforeseeable manner.

17

55.     Defendant advertised, promoted, marketed, sold, and distributed the Power P.A.C. as a safe medical device when Defendant knew or should have known the Power P.A.C. was not safe for its intended purposes and that the product could cause serious medical problems.

56.     Defendant had sole access to material facts concerning the defective nature of the Power P.A.C. product and its propensity to cause serious and dangerous side effects.

57.     In reliance on Defendant's representations, Plaintiff's doctor was induced to and did use the Power P.A.C.

58.     As a result of having the Power P.A.C. implanted, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, and has suffered financial or economic loss, including, but to limited to, obligations for medical services and expenses, and present and future lost wages.

59.     Defendant's Power P.A.C. was marketed to the medical community and to patients as safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

60.    The Defendant has marketed and sold the Defendant's Power P.A.C. to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

61.    The injuries, conditions, and complications suffered due to Defendant's Power P.A.C. include but are not limited to infection; necrosis; fracture and leakage; blood clots; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

62.    Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with her medical providers, the nature of her injuries and damages and their relationship to the Product was not discovered, and through reasonable care and diligence could not have been discovered until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

63.    Plaintiff did not learn of Defendant's wrongful conduct until a time within the applicable statute of limitations.  Furthermore, in the existence of due diligence, Plaintiff could not have reasonably discovered the Defendant's wrongful conduct, including, but not limited to, the defective design and/or manufacturing of the product until a date within the statute of limitations.  Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the statutory limitations period.

64.    Defendant was negligent toward Plaintiff in the following respects:

a.    Defendant failed to incorporate safer alternative designs in the Power P.A.C. that would have prevented IPC-related infection.

b.    Defendant failed to design and establish a safe, effective procedure for removal of Power P.A.C.; therefore, in the event of a failure, injury, or complications it is difficult to safely remove Power P.A.C.

c.    Defendant provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using Power P.A.C. for the purpose of increasing their sales.  By so doing, Defendant caused the dissemination of inadequate and misleading information to patients, including the Plaintiff.

65.    At the time of her operation, Plaintiff was not informed of, and had no knowledge of the complaints, known complications, and risks associated with Power P.A.C., including but not limited to the extent of seriousness of the danger of fracture and infection.

20

66.    Plaintiff was never informed by Defendant of the defective and dangerous nature of Power P.A.C.

67.    At the time of her implant, neither Plaintiff nor Plaintiff's physicians were aware of the defective and dangerous condition of Power P.A.C.

68.    As a result of the Defendant's actions and inactions, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
(Against Defendant ICU Medical)

69.    Plaintiff incorporates paragraphs 1 through 67 as if set out fully herein.

70.    The Defendant owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling, and conducting post-market surveillance of the Power P.A.C.

71.    The Defendant failed to exercise due care under the circumstances and therefore breached this duty by:

a.    Failing to properly and thoroughly test the Power P.A.C. before releasing the device to market, and/or failing to implement feasible safety improvements;

b.    Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the Power P.A.C.;

      c.  Failing to conduct sufficient post-market testing and surveillance of the Power P.A.C.;

      d.  Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the Power P.A.C.;

      e.  Designing, manufacturing, marketing, advertising, distributing, and selling the Power P.A.C. to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the Power P.A.C. and without proper instruction to avoid the harm which could foreseeably occur as a result of using the device;

      f.  Failing to exercise due care when advertising and promoting the Power P.A.C.; and

      g.  Negligently continuing to manufacture, market, advertise, and distribute the Power P.A.C. after Defendant knew or should have known of its adverse effects.

72.  As a direct, actual, and proximate cause of the Defendant's actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

73.     In performing the foregoing acts, omissions, and misrepresentations, Defendant acted grossly negligent, fraudulently, and with malice.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN
(Against Defendant ICU Medical)

74.     Plaintiff incorporates paragraphs 1 through 67 as if set out fully herein.

75.     Defendant designed, set specifications, manufactured, assembled, processed, marketed, labeled, distributed, and sold the Power P.A.C., including the one implanted in Plaintiff, into the stream of commerce and in the course of the same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

76.     At the time Defendant designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer the medications. Defendant failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities and further failed to adequately provide instructions on the safe and proper use of the device.

77.     Defendant knew or should have known at the time they manufactured, labeled, distributed and sold the Power P.A.C. that was implanted into Plaintiff that the Power P.A.C. posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

78.     Defendant failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Power P.A.C.; no reasonable health care provider, including Plaintiff's, and no reasonable patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

79.     The warnings, labels, and instructions provided by the Defendant at all times relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

80.     The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

81.     The Power P.A.C., which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendant, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions

24

accompanying the product.

82.   When Plaintiff was implanted with the device, Defendant failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

83.   Defendant intentionally underreported the number and nature of adverse events associated with fracture and migration of the devices to Plaintiff's health care providers, as well as the FDA.

84.   Upon information and belief, neither Plaintiff nor her health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

85.   Plaintiff and her health care providers used the Power P.A.C. in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream.

86.   Upon information and belief, the defective and dangerous condition of the device, including the one implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendant to distributors and/or healthcare professionals or organizations.

87.   Upon information and belief, the device implanted in Plaintiff was in

the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendant.

88.    Defendant's lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries, and economic damages in an amount to be determined at trial. Had Defendant provided adequate warnings, Plaintiff and her physicians would not have used the device.

89.    As a direct, actual, and proximate cause of the Defendant's actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

90.    In performing the foregoing acts, omissions, and misrepresentations, Defendant acted grossly negligent, fraudulently, and with malice.

**THIRD CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
(Against Defendant ICU Medical)

91.    Plaintiff incorporates paragraphs 1 through 67 as if set out fully herein.

92.    Defendant supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the Power P.A.C. implanted into Plaintiff.

93.    The Power P.A.C. implanted in the Plaintiff was not reasonably safe for its intended use and was defective with respect to its design.

94.    The Power P.A.C. was in a defective condition and was defective in its

26

design in that when it left the possession and control of Defendant, it was not safe for its anticipated use and safer, more reasonable alternative designs existed that could have been utilized by Defendant.

95.     The Power P.A.C. was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as Plaintiff and/or her physicians would expect when the product was used for its normal and intended purpose.

96.     The Power P.A.C. was expected to and did reach the consumer without substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

97.     A reasonably prudent medical device manufacturer would have recognized the defective design of the Power P.A.C. and not placed it into the stream of commerce.

98.     The design defects in the Power P.A.C. were not known, knowable and/or reasonably apparent to Plaintiff and/or her physician or discoverable upon any reasonable examination.

99.     The Power P.A.C. was used and implanted in the manner in which it was intended to be used and implanted by Defendant pursuant to the instructions for

1   use and the product specifications provided by Defendant.

2   100.   As a direct, actual, and proximate cause of the Defendant's actions,

3   omissions, and misrepresentations, Plaintiff has been injured and has sustained

4   economic and non-economic damages, both in the past and future, including for pain

5   and suffering and medical expenses.

6   101.   In performing the foregoing acts, omissions, and misrepresentations,

7   Defendant acted grossly negligent, fraudulently, and with malice.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
(Against Defendant ICU Medical)

11   102.   Plaintiff incorporates paragraphs 1 through 67 as if set out fully herein.

12   103.   Defendant impliedly warranted that the Power P.A.C. was

13   merchantable and fit for the ordinary purposes for which it was intended.

14   104.   When the Power P.A.C. was implanted in the Plaintiff, it was being

15   used for the ordinary purposes for which it was intended.

16   105.   The Plaintiff, individually and/or by and through her physician, relied

17   upon Defendant's implied warranties of merchantability in consenting to have the

18   Power P.A.C. implanted in her.

19   106.   Privity exists between Plaintiff and Defendant because Plaintiff's

20   physicians acted as Plaintiff's purchasing agents in the subject transaction and/or

21   because Plaintiff was a third-party beneficiary of the subject contract.

28

107.    Plaintiff was the intended consumer of the device when Defendant made the warranties set forth herein, and such warranties were made to benefit Plaintiff as a patient and consumer.

108.    Defendant breached these implied warranties of merchantability because the Power P.A.C. implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but were not limited to, variances in the following respects:

a.  Defendant's manufacturing process in constructing the catheter of the Power P.A.C. implanted in Plaintiff involved too high of a concentration of barium sulfate particles for the polymer formulation, which led to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

b.  Defendant knew or should have known barium sulfate is known to contribute to a reduction in the mechanical integrity of the silicone in its product, the Power P.A.C., as the barium sulfate particles dissociate from the surface of the catheter over time; and

c.  These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the

higher barium sulfate concentration that ultimately led to the collection and proliferation of blood products, thereby drastically increasing the risk of biofilm, infection, and sepsis.

109.   Defendant's breaches of their implied warranties resulted in the implantation of an unreasonably dangerous and defective product, the Power P.A.C., into Plaintiff's body, placing said Plaintiff's health and safety in jeopardy.

110.   The Power P.A.C. was sold to Plaintiff's health care providers for implantation in patients, such as Plaintiff.

111.   As a direct, actual, and proximate cause of the Defendant's actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

112.   Upon information and belief, Plaintiff's healthcare providers sent notice to Defendant of the adverse event that occurred to Plaintiff and thus, the nonconformity of the Power P.A.C., within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

**FIFTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
(Against Defendant ICU Medical)

1    (Cal. Com. Code § 2313; *Hauter v. Zogarts*, 534 P.2d 377 (Cal. 1975); 21 U.S.C. §

2    352; 21 C.F.R. § 801.6; *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984);

3    *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996))

4

5        113.    Plaintiff incorporates paragraphs 1 through 67 as if set out fully herein.

6        114.    Defendant ICU Medical, through written documentation, oral

7    affirmations by its representatives, product labeling, Instructions For Use

8    (hereinafter IFUs), and promotional literature, expressly warranted that its

9    implantable port-catheter system (referred to as the Power P.A.C.) was safe,

10   effective, fit for its intended purpose, and properly regulated under applicable federal

11   law.[19]

12       115.    These express warranties included:

13           a.  Representations that the Power P.A.C. system had been clinically

14               tested and approved;

15           b.  Assurances that its safety profile was equivalent or superior to prior

16               versions;

17           c.  Statements that its implantable port catheter system design would

18               safely address a broader range of patient conditions with improved

19               outcomes;

---

[19] "An effective combination for safe long-term intravenous therapy." (Patient Guide
Supplement, An educational supplement sponsored by icumedical human connections in the
British Journal of Nursing, pg.1).

**d.** Assurances by sales representatives and in written communications designed for patients that that the Power P.A.C. was safer and more effective in preventing infection than competing devices of implantable port catheter systems;[20]

116.    These express warranties were made to Plaintiff, Plaintiff's physicians, and the broader medical community to induce reliance and promote the use of the Power P.A.C. system over other alternatives.

117.    These warranties were false. At the time of sale and implantation:

a.  The device had not been tested in its final configuration;

b.  Its design and component composition had been substantively altered through unvalidated PMA Supplements;

c.  Its clinical safety for patients with autoimmune conditions had not been demonstrated; and

d.  Known adverse effects, including infection, stroke and heart attack had been omitted from product disclosures.

118.    The Power P.A.C. system did not conform to ICU Medical's express representations and was not of the quality or safety promised at the time of sale.

---

[20] "[I]mplanted ports offer a wide range of benefits (Table 1) that not only reduce risk factors, such as thrombosis and infection, but also help preserve vessel health." (Patient Guide, Understanding an Implantable Port, distributed by icumedical human connections, pg.2 (designed for patients and healthcare providers).

119.    Plaintiff relied on these warranties in choosing to proceed with implantation, and her healthcare providers relied on ICU Medical's literature, IFUs, and representative support in recommending the device.

120.    California law recognizes a cause of action for breach of express warranty under Cal. Com. Code § 2313. (*Hauter*, 534 P.2d at 382-83), where a seller's affirmations or descriptions form the basis of the bargain. California applies the same rule under Cal. Com. Code § 2313. (*Hauter*, 534 P.2d at 382-83).

121.    ICU Medical's breach of its express warranties was a substantial factor in causing Plaintiff's injuries. The device failed to perform as warranted, and Plaintiff suffered neurological symptoms, pain, and dysfunction as a direct result.

122.    As a result of the device failure, Plaintiff suffered internal injury, required revision surgery, and incurred substantial medical expenses.

123.    Plaintiff's device failed and caused severe infection, contrary to Defendant's express assurances of safety and durability.

124.    Plaintiff's implanting physician and Plaintiff herself relied on these representations when selecting and implanting the device.

125.    This claim is not preempted. Express warranty liability arises from Defendant's own voluntary statements and representations and does not impose any additional or different federal requirement. (*Lohr*, 518 U.S. at 503; *Silkwood*, 464 U.S. at 256).

33

126.    The Defendant is in a superior position to identify and produce its own express warranties and representations.  Plaintiff intends to seek these materials during the discovery process.

127.    On information and belief, Defendant expressly warranted through its product labeling and promotional materials that the device was safe for subcutaneous use. These materials are in Defendant's possession and will be identified more precisely once discovery commences.

**SIXTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
(Against Defendant ICU Medical)

128.    Plaintiff incorporates paragraphs 1 through 67 as if set out fully herein.

129.    Defendant made false statements and representations to Plaintiff and her healthcare providers concerning the Power P.A.C. product implanted in Plaintiff.

130.    Defendant engaged in and fraudulently concealed information with respect to the Power P.A.C. in the following respects:

a.    Defendant represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the Power P.A.C. was safe and fraudulently withheld and concealed information about the substantial risks of using the Power P.A.C., including but not limited to, its heightened propensity to precipitate infection, and cause

34

complications;

    b.  Defendant represented that the Power P.A.C. was safer than other alternative systems and fraudulently concealed information which demonstrated that the Power P.A.C. was not safer than alternatives available on the market;

    c.  Defendant concealed that it knew these devices were fracturing and migrating from causes other than the manner in which the implanting physician implanted the device; and

    d.  That frequency of these failures and the severity of injuries were substantially worse than had been reported.

131.   Defendant had knowledge that the representations they made concerning the Power P.A.C., as stated above, were false.

132.   Defendant had sole access to material facts concerning the dangers and unreasonable risks of the Power P.A.C.

133.   The concealment of information by the Defendant about the risks of the Power P.A.C. was intentional.

134.   The concealment of information and the misrepresentations about the Power P.A.C. was made by the Defendant with the intent that Plaintiff's health care providers and Plaintiff rely upon them.

135.   Plaintiff and her physicians relied upon the representations and were

unaware of the substantial risks of the Power P.A.C. which the Defendant concealed from the public, including Plaintiff and her physicians.

136.    As a direct and proximate result of the Defendant's actions, omissions and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

137.    The Defendant acted with oppression, fraud, and malice towards Plaintiff.

138.    Had Defendant not concealed this information, neither Plaintiff's nor her health care providers would have consented to using the device in Plaintiff.

## **PRAYER**

**WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

      a.    Judgment be entered against Defendant on all causes of action of this Complaint;

      b.    Plaintiff be awarded her full, fair, and complete recovery for all claims and causes of action relevant to this action;

      c.    Plaintiff be awarded general damages according to proof at the time of trial;

      d.    Plaintiff be awarded damages, including past, present, and future,

1    medical expenses according to proof at the time of trial;

2    e.    Awarding pre-judgment and post-judgment interest to the Plaintiff;

3    f.    Awarding the costs and the expenses of this litigation to the

4    Plaintiff.

5    g.    For such other and further relief as the court may deem just and

6    proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues

Respectfully submitted,


/s/ Ruth Rizkalla
Dated:    July 18, 2025    Ruth Rizkalla #224973
**THE CARLSON LAW FIRM**
1500 Rosecrans Ave., Suite 500
Manhattan Beach, CA 90266
Tel: (800) 359-5690
Email: RRizkalla@carlsonattorneys.com


/s/ Aaron K. Dickey
Aaron K. Dickey #6281731 IL
**DICKEY ANDERSON LAW FIRM, LLC**
1104 Moorlands Drive, 2nd Floor
St. Louis, MO 63117
Tel: (314) 810-7668
Email: aaron@dickeyanderson.com

*Attorney for Plaintiff*